**Larry D. CROWE, et al.**

v.

**James W. SMITH, et al.**

**Civ. A. No. 92–2164–M.**

United States District Court,
W.D. Louisiana,
Monroe Division.

May 23, 1994.

534

Joseph R. Ward, Jr., Lynn H. Frank, Ward & Clesi, New Orleans, LA, John T. McDowell, Bankston & McDowell, Houston, TX, for Larry D. Crowe, Sue Ellen Silman Crowe.

Joseph R. Ward, Jr., Lynn H. Frank, Ward & Clesi, New Orleans, LA, for Pioneer Produce Co.

Leroy Smith, Jr., Tallulah, LA, for James W. Smith.

James Eugene Mixon, Columbia, LA, for Russell Hart.

Robert S. Rooth, Corinne A. Morrison, James C. Young, Chaffe McCall, Phillips, Tolera & Sarpy, New Orleans, LA, Anne B. Sobol, Slidell, LA, Susan R. Laporte, Metairie, LA, for Agrarian Development Corp., M.L.M. Services Inc., James W. Berry, Coenen & Berry, Rayville, LA, J. Allen Harvey,

Jr., Monroe, LA, for Vernon McCrory, James E. Wooldridge, Bobby Thrialkill, Hugh Roche, Dwight Vines.

William E. Wright, Jr., Judy L. Burnthorn, Nancy J. Marshall, Deutsch Kerrigan & Stiles, New Orleans, LA, for Johnny Dollar.

Raymond J. Salassi, Jr., Jones, Walker, Waechter, Poitevent Carrère & Denègre, New Orleans, LA, Kurt D. Engelhardt, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, for McLeod Swearingen Verlander et al.

Robert B. Bieck, Jr., Raymond J. Salassi, Jr., Virginia W. Gundlach, Jones, Walker, Waechter, Poitevent Carrère & Denègre, New Orleans, LA, for Robert P. McLeod, Lawson L. Swearingen, David E. Verlander, III.

Kurt D. Engelhardt, Hailey McNamara, Hall, Larmann & Papale, Metairie, LA, W. Glenn Burns, Hoffman Sutterfield, Ensenat & Bantston, A Professional Law Corp., New Orleans, LA, Judy L. Burnthorn, Nancy J. Marshall, Deutsch Kerrigan & Stiles, New Orleans, LA, for Elmer G. Noah, II, Kirby O. Price.

Robert S. Rooth, Corinne A. Morrison, James C. Young, Chaffe McCall, Phillips, Tolera & Sarpy, New Orleans, LA, for Resolution Trust Corp.

Colette J. Winston, U.S. Dept. of Justice, Torts Branch Civ. Div., Washington, DC, for U.S.

M. James Chaney, Jr., Teller Martin, Chaney & Hassell, Vicksburg, MS, for Merchants Bank N.A.

Stephen L. Harrison, Shafto & Ashbrook, Monroe, LA, for L. Michael Ashbrook.

Thomas Davenport, Jr., Davenport Files & Kelly, J. Allen Harvey, Jr., Monroe, LA, for Malcolm Maddox.

### RULING

NAUMAN S. SCOTT, District Judge.

Before the court is a Motion to Dismiss and an alternative Motion for Summary Judgment filed on behalf of defendant Resolution Trust Corporation (RTC). RTC urges this court to dismiss the First through Fourth and Sixth Claims for Relief of the Complaint, as amended, of plaintiffs, Larry D. Crowe (Crowe), Pioneer Produce Co. and Sue Ellen Crowe Silman as Administratix of the Succession of Reba Crowe (collectively referred to as plaintiffs or "the Crowes").

### I. *Factual Background*

This lawsuit arises from a series of land dealings centering on two properties known as Eagle Bend and Australia Island.[1] In 1979, Crowe sold 410 acres of land known as the Forrest Tract and put up $700,000 in cash as a down payment to buy the 9,000-acre Morrissey Property in Mississippi. The total price of this land was $5.3 million. The Morrissey Family Trust financed the remaining $4.6 million owed on this property with a note payable over 30 years at a 6% rate of interest. This land became known as Eagle Lake Farms. Crowe took out an additional $800,000 in loans from the Farmer's Home Administration (FmHA) to develop the property and build 10 homes there.

In the early part of 1985, Crowe sought a loan from People's Homestead Federal Bank for Savings (Old People's) so that he could develop Eagle Bend more rapidly. Instead of entering into a loan agreement, however, Crowe became a partner in a wholly-owned subsidiary of Old People's, Agrarian Development Corporation (Agrarian). Old People's board of directors approved the partnership in a meeting on March 19, 1985. The Crowe/Agrarian partnership became known as Eagle Bend Development. In that same meeting, the directors also voted to give Russell Hart, the president of Old People's, control over the operation of Eagle Lake Development. On April 3, 1985, Crowe conveyed Eagle Bend Farms to the Eagle Bend Development partnership.

Under the partnership agreement, Old People's assumed 50% of the Morrissey loan and 50% of the obligation to FmHA. Old People's also agreed to pay the sum of $3.5 million to liquidate debts on the property and to create a $1 million capital account to finance future development of the project. In exchange, Crowe transferred to the partner-

---

1. For the purposes of this Ruling, we need not discuss the events relating to Australia Island.

ship a 50% interest in his Eagle Lake assets, including the farm land, condominiums, houses, a flying service, and farm equipment.

Plaintiffs allege that soon after the formation of the partnership, Russell Hart; the officers and directors of Old People's; Johnny Dollar; the law firm of McLeod, Swearingen, Verlander, Dollar, Price & Noah; and Sonny Smith devised a plan to fraudulently take over Crowe's interest in Eagle Bend and to squeeze him out of his interest in Australia Island. The purported scheme involved whipsawing Crowe in a flurry of legal proceedings (including the fraudulent institution of bankruptcy lawsuits, liquidation actions, and foreclosure proceedings), starving Crowe for cash, and overpowering Crowe through their greater resources, such as their retainer of attorneys Johnny Dollar and Robert McLeod.

We need not detail the complex chronology of events, as detailed in the Complaint and RICO Case Statement, plaintiffs allege took place between 1986 and 1990 in furtherance of the defendants' scheme to divest Crowe of his interest in Eagle Bend and Australia Island. Instead, a brief, noncomprehensive listing of the allegations shall suffice. Plaintiffs claim that the defendants ousted Crowe as farm manager; refused to allow Eagle Bend's participation in a U.S. Department of Agriculture farm subsidies program; instituted a fraudulent foreclosure proceeding in West Carroll Parish claiming Crowe had used this property to cross collateralize crop loans made by the two farm partnerships; created an emergency situation to justify their obtaining Chapter 11 and Chapter 7 bankruptcy orders; refused to pay for the construction of sewers and streets at Eagle Bend, thus preventing the sale of condominiums; forbade the leasing of land to farmers whose rent payments might have covered the note obligations; and demanded his payment, but not that of his partners Smith and Agrarian, of crop loans for Eagle Bend and Australia Island.

Crowe, now claiming he was financially exhausted and unable to continue litigation, entered into a compromise agreement with Agrarian. Old People's incorporated MLM Systems, Inc. to take over Crowe's 50% interest in Eagle Bend Development. Plaintiffs claim that Old People's, Agrarian and MLM violated the compromise agreement by preventing Crowe from gaining title to an airplane and by failing to obtain his release from the FmHA mortgages.

RTC entered the picture on October 19, 1989, when, by order of the Director of the Office of Thrift Supervision (OTS), it was appointed as sole receiver of Old People's. RTC reorganized the bank as People's Homestead Savings Bank, FSB (New People's). By virtue of a Purchase and Assumption Agreement between New People's and RTC–Receiver, also dated October 19, 1989, New People's acquired the assets and certain liabilities of RTC–Receiver. By further order of the Director of OTS, RTC was appointed Conservator of New People's. On August 2, 1991, OTS replaced RTC acting as Conservator of New People's with RTC acting as Receiver of New People's.

After RTC put Eagle Bend up for sale, Crowe sought to repurchase the property and found financing with a group of Tennessee investors, who submitted a written purchase offer. RTC rejected the offer, ruling that the offer did not meet bidding conditions. Plaintiffs allege that RTC refused to inform Crowe of the conditions of the bid, failed to provide him with a property brochure and refused to meet with him and his financial backer, James Rainer.

On January 25, 1990, Crowe filed suit seeking to enjoin the sale of Eagle Bend. Crowe alleged that RTC attorneys represented to the trial court that the property was not for sale. Accordingly, the court denied Crowe's motion for injunctive relief on April 24, 1990. *See Larry Dean Crowe v. Eagle Bend Development,* No. 90–356 (La. Dist.Ct.4th 1990). That same day, Sonny Smith purchased Eagle Bend for $10.00 and an assumption of the Morrissey note.[2] The purchase agreement did not include a provision indicating who should pay for the remaining debt on the FmHA note for which Crowe was liable.

2. Smith's purchase was subject to an option to buy held by Russell Hart.

Plaintiffs filed this suit on December 2, 1992, naming 19 separate defendants.[3] The Complaint, as amended, seeks relief for violations of 18 U.S.C. §§ 1962(a), (b), (c) and (d) (civil RICO); sets forth state law causes of action for fraud, unfair trade practices, intentional infliction of emotional distress, breach of fiduciary duty, tortious interference with contract rights, and breach of contract; asks for a declaration that Mississippi judgments are null and void; and prays for relief from the RTC under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*

## II. *Law and Analysis*

RTC urges the court to dismiss the First through Third Claims for Relief, which allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* (civil RICO), because neither RTC–Receiver nor RTC–Conservator can have vicarious liability as the successor to Old People's. RTC also asserts that plaintiffs have no right of action against it and lack standing to assert claims against it for alleged violations of 12 U.S.C. § 1441a(a)(14)(B), as set forth in the Sixth Claim for Relief. Further, RTC maintains that the claims of fraud, unfair trade practices, intentional infliction of emotional distress, and tortious interference with contract rights found in the Fourth Claim for Relief should be dismissed as prescribed. Last, RTC contends that plaintiffs' allegations regarding breach of fiduciary duty and breach of contract, also set forth in the Fourth Claim for Relief, fail to state a claim against RTC–Receiver or RTC–Conservator.

**3.** The plaintiffs filed an amended complaint on January 4, 1993.

**4.** We set forth RTC's position here in detail, as well as the grounds for our holding, to preempt any potential confusion over whether this Ruling serves to confirm or concur with the arguments urged upon us by RTC. We reiterate that this Ruling does not address the issue of whether RTC can be vicariously liable for RICO violations.

**5.** 12 U.S.C. § 1441a(a)(14)(A) authorizes RTC's chief executive officer "to implement the strategic plan for conducting the Corporation's func-

### A. *The Crowes' RICO Claims*

RTC breaks down into three subparts its argument that it cannot, acting either as Receiver or Conservator, have vicarious liability under RICO as the successor to Old People's. First, RTC asserts that RICO does not allow for vicarious liability. Second, RTC claims that plaintiffs fail to set forth the elemental "pattern of racketeering activity" required to hold either RTC–Receiver or RTC–Conservator liable under RICO. Third, RTC contends that plaintiffs cannot use RICO against it because an award of punitive damages against RTC is contrary to caselaw and public policy.

The Crowes do not refute RTC's motion to dismiss the RICO claims. Indeed, plaintiffs admit that "they do not seek RICO damages from RTC since the RTC was not involved in the conspiracy to defraud the Crowes of their interest in Eagle Bend and Australia Island and since it cannot be required to pay punitive damages." Mem. in Opp. to RTC's 12(b)(6) Mot. at 6. Because plaintiffs admit that they have no valid RICO claims against RTC, we need not rule on the merits of RTC's position that it cannot be held vicariously liable under RICO and we dismiss the First through Third Claims for Relief as to RTC.[4]

### B. *The Crowes' Claims Under 12 U.S.C. § 1441a(a)(14)*

The Crowes' Sixth Claim for Relief alleges that RTC violated its standards[5] for adequate competition and fair and consistent treatment of offerors, 12 U.S.C. § 1441a(a)(14)(B)(viii),[6] in the sale of Eagle Bend. RTC contends that this statutory

tions and activities submitted by the former Oversight Board to the Congress, dated December 31, 1989." The provisions of the plan are set forth at 12 U.S.C. § 1441a(a)(14)(B) and include subsection (viii), which mandates "[s]tandards for adequate competition and fair and consistent treatment of offerors."

**6.** This provision is part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended by the RTC Thrift Depositor Protection Reform Act of 1991 in scattered sections of 12 U.S.C.).

provision does not afford plaintiffs a private cause of action.[7]

Because FIRREA does not explicitly provide a cause of action for an alleged violation of § 1441a(a)(14)(B)(viii), we must determine whether an implied right of action lies in the statute. In making this determination, we must consider the four factors established by the United States Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). These factors are:

> First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.*, at 78, (internal quotation marks and citations omitted; emphasis in original). The Court recently made clear that the "most important inquiry here ... is whether Congress intended to create the private remedy sought by the plaintiffs." *Suter v. Artist M.*, 503 U.S. ——, ——, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1, 16 (1992). The Court also noted that "the burden is on [plaintiffs] to demonstrate that Congress intended to make a private remedy available to enforce" a statutory provision. *Id.*

■ The first *Cort* factor compels an investigation of whether plaintiffs are among the class of persons for whose especial benefit the statute was enacted. A House Report summarizing the major provisions of FIRREA begins:

### I. Managing the crisis

> The interests of the American taxpayer demand an expedited resolution to the monumental problems involved with the unprecedented costs of dealing with the hundreds of insolvent thrifts and the orderly disposition of the assets of these failed institutions.

H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 308 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 104.

Because Congress enacted FIRREA in the interest of the taxpayers, all tax-paying Americans could make a colorable argument that they satisfied the first *Cort* inquiry. A narrower reading of the first *Cort* factor still compels an answer in favor of the plaintiffs here before us. Congress clearly intended for FIRREA to provide a vehicle for the "orderly disposition of the assets of these failed institutions." *Id.* To this end, FIRREA requires the implementation of a Strategic Plan, which includes among its mandatory provisions plans for the disposition of assets; standards for adequate competition and fair and consistent treatment of offerors (the provision at issue here); standards that prohibit discrimination on the basis of race, sex, or ethnic group in the solicitation and consideration of offers; procedures for the active solicitation of offers from minorities and women; and procedures requiring that unsuccessful offerors be notified in writing of the decision within 30 days after the offer has been rejected. 12 U.S.C. §§ 1441a(a)(14)(B)(iv), (vii), (viii), (ix), (x), (xi). The statute on its face, therefore, furnishes procedures and standards which protect and benefit offerors in RTC's asset disposition process. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) ("[O]ur analysis must begin with the language of the statute itself.").

---

**7.** The plaintiffs also allege that RTC violated 12 U.S.C. § 1441a(a)(14)(B) (xvii), which compels RTC to follow "[p]olicies and procedures for avoiding political favoritism and undue influence in contracts and decisions made by the Thrift Depositor Protection Oversight Board and the Corporation." A plain reading of this provision indicates that it is aimed at curtailing *political* favoritism and influence, which the Crowes do not allege. Because the plaintiffs fail to set forth any evidence that this provision was intended to reach beyond political favoritism and influence, we find that plaintiffs fail to carry their burden to demonstrate that Congress intended to create a private right of action under this provision. Accordingly, we only address the issue of whether Congress intended to create a private right of action under 12 U.S.C. § 1441a(a)(14)(B)(viii).

As noted above, the second *Cort* factor—is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one ?—is "the most important inquiry." *Suter v. Artist M.,* 503 U.S. ——, 112 S.Ct. at 1370, 118 L.Ed.2d at 16; *see also Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted."). Again, we find that the statute itself, read as a whole, provides the clearest indication of whether Congress intended to provide disappointed offerors a private right of action to sue the RTC for its violation of § 1441a(a)(14)(B)(viii).

As noted above, the mandatory provisions of the Strategic Plan, cataloged in § 1441a(a)(14)(B), require RTC to comply with procedures and standards which protect and benefit offerors. 12 U.S.C. §§ 1441a(a)(14)(B)(iv), (vii), (viii), (ix), (x), (xi).[8] However, § 1441a(a)(8), entitled "Limitation on authority," makes clear that the Thrift Depositor Protection Oversight Board (TDP Oversight Board), the instrumentality charged with overseeing and monitoring RTC's operations, has no authority to review, approve or disapprove "case-specific matters involving (i) individual case resolutions, (ii) asset liquidations, or (iii) day-to-day operations of the Corporation." 12 U.S.C. § 1441a(a)(8). Instead, FIRREA grants the Oversight Board full authority "to review overall strategies, policies, and goals established by the Corporation." *Id.*

Thus, it is clear that while Congress established guidelines for fair bidding in the disposition of RTC assets, it did not wish for the TDP Oversight Board to become entangled in micro-management of RTC's case-specific matters. The seminal *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859, 864 (D.C.Cir.1970) opinion, however, established the sound principle that

> [w]hen Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests. . . .

*Accord Rapides Regional Medical Ctr. v. Secretary, Dep't of Veterans' Affairs,* 974 F.2d 565, 570 (5th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993); *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1265 (5th Cir.1978); *Hayes Int'l Corp. v. McLucas,* 509 F.2d 247, 254–58 (5th Cir.1975) (adopting *Scanwell), cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92. This principle is well-illustrated in a recent opinion issued by the United States Court of Appeals for the Second Circuit addressing a parallel FIRREA issue. In assessing whether a complaining bidder could sue the Federal Deposit Insurance Corporation (versus RTC) under FIRREA, the Second Circuit noted that in some disappointed bidder "cases, because the statutes were intended in part to protect the bidders' rights, it was reasonable to conclude that suits by disappointed bidders were consistent with the statutory scheme." *Gosnell v. Fed. Deposit Ins. Corp.,* 938 F.2d 372, 376 (2nd Cir.1991) (citing *Scanwell).*[9]

---

8. The actual Strategic Plan was submitted to Congress on December 31, 1989 (A copy of the plan was supplied by the Thrift Depositor Protection Oversight Board (TDP Oversight Board) and remains on file with the court. The proposed Strategic Plan was published at 54 Fed.Reg. 46574–46586. The extracts cited below are identical in the proposed and final Strategic Plans; therefore, we cite to the proposed plan for ease of reference.). The "Asset Disposition" section sets forth in detail the goals, objectives and implementation procedures mandated by § 1441a(a)(14)(B). Among these are objectives calling for establishing "appropriate methods of disposition ... keeping market participants and other interested parties fully informed, to the

extent practical, on RTC's inventory and plans for asset sale," requiring private management groups to "assure[] open and fair competition for asset management and disposition contracts," as well as implementation procedures establishing "written procedures for accepting and investigating complaints of discrimination or unfair treatment in the consideration of offers of services to the RTC" and establishing "guidelines to assure open and fair competition for asset management and disposition contracts." 54 Fed.Reg. at 46583–84.

9. The *Gosnell* court compared the treatment of RTC and FDIC under FIRREA, noting that RTC "is obligated to establish standards for fair and

Because Congress in FIRREA mandated the establishment of procedures and standards to protect offerors, the statute itself indicates legislative intent to create a remedy for breaches of these standards and procedures. However, the statute explicitly precludes the TDP Oversight Board from providing such a remedy. We find it highly implausible, as Movants suggest, *see* RTC's Supp.Mem. at 6–7, that Congress intended to place itself in the position of reviewing the individual asset dispositions of hundreds of insolvent thrifts. Congress did foresee, however, that RTC would be sued. 12 U.S.C. § 1441a(b)(9)(E). Finding no other remedial procedure for those offerors who allege RTC failed to provide adequate competition or fair and consistent treatment in its asset disposition process, *see* § 1441a(a)(14)(B)(viii), we conclude that Congress, by providing protections to offerors with no explicit remedial procedures, implicitly intended a private right of action to lie under § 1441a(a)(14).

■ Having answered the second, pivotal *Cort* inquiry in favor of plaintiffs, we now address the third *Cort* inquiry—i.e., is it consistent with the underlying purposes of the legislative scheme to imply such a private right of action for the plaintiff? 422 U.S. at 78, 95 S.Ct. at 2088. As mentioned above, one of the central purposes of FIRREA is to foster an "expedited resolution to the monumental problems involved with the unprecedented costs of dealing with the hundreds of insolvent thrifts and the orderly disposition of the assets of these failed institutions." H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 308 (1989), *reprinted in* 1989 U.S.C.C.A.N. at 104. In reviewing the causes behind the thrift industry crisis, Congress noted that "it is clear that fraud and insider abuse has been a major factor in a significant portion of thrift failures in the late 1980's." H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 300 (1989), *reprinted in* 1989 U.S.C.C.A.N. at 96. In order to prevent such insider abuse in the disposition of the assets of failed institutions, Congress enacted the mandatory provisions of RTC's Strategic Plan, including the fair bidding requirements of § 1441a(a)(14)(B)(viii).

As we discussed in our analysis of the second *Cort* factor, when Congress sets forth mandatory guidelines in a certain area, there should be procedures whereby those protected by such guidelines may seek redress for violations thereof. *See Scanwell* 424 F.2d at 864. FIRREA does not explicitly provide such remedial procedures for those who allege they were treated unfairly by an RTC official or bank insider (often one and the same) in a failed institution's asset disposition process. Therefore, it is entirely consistent with the purposes of FIRREA, especially in light of the absence of other remedies, to grant a private right of action "whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests, while at the same time furthering the public interest." *Id.*

■ We move now to the fourth and final *Cort* inquiry—i.e., is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? 422 U.S. at 78, 95 S.Ct. at 2088. This question is indisputably answered in plaintiffs' favor. FIRREA creates federal policy for the proper management of federally-insured financial institutions. RTC is charged through FIRREA with, *inter alia*, disposing of the assets of failed thrifts. Whether a federal agency disposes of federal assets properly under federal law is obviously an issue of federal concern. Inferring a private right of action under FIRREA does not, therefore, impinge on state law or state interests.

Our analysis of the four *Cort* factors reveals that Congress intended to make a private remedy available for offerors to seek redress for alleged violations of § 1441(a)(14)(B)(vii). Accordingly, we deny defendants' motion to dismiss plaintiffs' Sixth Claim for Relief.

consistent treatment of bidders, *see* 12 U.S.C. § 1441a(a)(14)" and "the fact that Congress imposed these [fair bidding] requirements on the RTC while simultaneously granting the FDIC broad the discretionary powers." 938 F.2d at 376.

C. *The Crowes' Claims of Fraud, Unfair Trade Practices, Intentional Infliction of Emotional Distress, and Tortious Interference with Contract Rights*

█ RTC asserts that the Crowes' fraud, unfair trade practices, intentional infliction of emotional distress and tortious interference with contract rights claims, as set forth in the Fourth Claim for Relief, should be dismissed as barred by prescription. RTC refers to codefendant Johnny Dollar's Motion to Dismiss and alternative Motion for Summary Judgment, which we addressed in our Ruling dated February 23, 1994. There, we found plaintiffs' tort claims to be barred by Louisiana's one year prescriptive period, La. Civ.Code art. 3492, and plaintiffs' unfair trade practices claims to be precluded by the one year peremptive limitations period. La. R.S. 51:1409(E). Because the Crowes allege no tortious conduct or unfair trade practices within the year prior to the institution of this lawsuit, and because they offer no opposition to RTC's time bar arguments, we dismiss the claims of fraud, unfair trade practices, intentional infliction of emotional distress and tortious interference with contract rights filed against RTC.

D. *The Crowes' Claims of Breach of Contract Fiduciary Duty*

█ The Fourth Claim for Relief also alleges claims of breach of contract and breach of fiduciary duty. These claims stem from the provision in the 1986 Compromise Agreement wherein MLM and Agrarian agreed to hold Crowe harmless from certain debts of Eagle Bend, including the FmHA loan. Act of Sale, Compromise and Release para. 24.

RTC maintains that plaintiffs cannot state such claims against it because neither Old People's nor New People's entered into partnerships with Crowe and because New People's did not assume any contractual or fiduciary obligations from Old People's. Plaintiffs rebut RTC's positions with two counterarguments. First, they state that RTC–Receiver assumed all of Old People's liabilities, including the obligations of its subsidiaries Agrarian and MLM. Second, plaintiffs urge us to pierce the corporate veil separating RTC–Conservator from Agrarian and MLM, thus opening RTC to potential liability for non-performance of the compromise agreement.

In assessing this Rule (12)(b)(6) motion to dismiss, we remain mindful of the time-honored and "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see also Garrett v. Commonwealth Mortg. Corp. of America,* 938 F.2d 591, 593 (5th Cir.1991) ("Unless it appears to a certainty that plaintiffs can prove no set of facts that would entitle them to relief, we cannot uphold an order of dismissal under rule 12(b)(6)."). In light of this extremely high standard and the liberal pleading requirements under Rule 8, we find that we cannot grant RTC's motion. Plaintiffs' Complaint sets forth an adequate generalized statement of facts in support of their claims of breach of contract and fiduciary duty. We leave for another day our determination of whether plaintiffs' evidentiary facts can surmount the intermediate legal hurdles they must pass in order to hold RTC liable for breach of contractual or fiduciary duties.

III. *Conclusion*

Accordingly, the Motion to Dismiss plaintiffs' RICO claims and alternative Motion for Summary Judgment filed by Resolution Trust Corporation is hereby **GRANTED.**

The Motion to Dismiss plaintiffs' claims under § 1441a(a)(14) and alternative Motion for Summary Judgment filed by RTC is hereby **DENIED.**

The Motion to Dismiss plaintiffs' fraud, unfair trade practices, intentional infliction of emotional distress and tortious interference with contract rights claims filed by RTC is hereby **GRANTED.**

The Motion to Dismiss plaintiffs' breach of contract and fiduciary duty claims and alter-

542

native Motion for Summary Judgment filed by RTC is hereby **DENIED.**