The UNITED STATES of America, J. Michael Martin, and Frederick C. Moore, Plaintiffs,

v.

BALD EAGLE REALTY, a Utah corporation, Jon Olch, Janet Olch, Henry Sigg, and Timothy Lapage, individually, Defendants.

No. 2:95 CV 1058 K.

United States District Court, D. Utah, Central Division

April 6, 1998.

Stephen J. Sorenson, U.S. Attorneys Office—Utah, Michael F. Hertz, Alan E. Kleinburd, Justin G. Castillo, U.S. Department of Justice, Washington, DC, Joseph E. Tesch, David B. Thompson, Jennifer L. Ross, Tesch Thompson & Vance, Park City, UT, David N. Sonnenreich, Weiss Berrett Sonnenreich Loyd LC, Salt Lake City, UT, William Ryan, U.S. Attorneys Office—Utah, for plaintiffs.

Gordon C. Strachan, Todd D. Wakefield, Strachan & Strachan, Park City, UT, Robert R Wallace, Lisa J. Watts Baskin, Mark J. Williams, Hanson Epperson & Wallace, Richard D. Burbidge, Stephen B. Mitchell, Burbidge & Mitchell, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KIMBALL, District Judge.

This matter is before the Court on the motion for summary judgment of Defendants Bald Eagle Realty, Jon Olch, Janet Olch, Henry Sigg, and Timothy Lapage ("Defendants") and the motion for partial summary judgment of Plaintiffs J. Michael Martin and Frederick C. Moore ("Plaintiffs").

### I. FACTUAL BACKGROUND

Plaintiff J. Michael Martin was the sole unsuccessful bidder for the purchase of a piece of property held by the Resolution Trust Corporation ("RTC") and sold by sealed bid. Located on historic Main Street in Park City, the property had exceptional development potential.

The RTC contracted with Coopers & Lybrand ("Coopers") to dispose of the property. In turn, Coopers contracted with Defendant Bald Eagle Realty ("Bald Eagle") to serve as the seller's listing broker for the property. Defendant Jon Olch owned Bald Eagle and served as its principal broker. His wife Janet also worked as a Bald Eagle broker. The contract between Coopers and Bald Eagle was the standard listing agreement used by the RTC.

The listing agreement contained several provisions obligating Bald Eagle to disclose any conflicts or potential conflicts of interest that developed in its representation of the RTC in the sale of the property. Pursuant to § 2.1, if Bald Eagle or any of its employees or agents was the purchaser or "in way related to the purchaser," Bald Eagle was required to fully disclose the relationship to Coopers in writing as soon as Bald Eagle became aware of it. Pursuant to § 2 of the listing agreement's general terms, Bald Eagle was required to immediately advise Coopers of any potential or actual conflicts of interest as defined by 12 C.F.R. Part 1606.

Olch made a formal offer to buy the property, but his offer was rejected in writing by Thomas Morton, an asset manager at Coopers. Morton's rejection letter reminded Olch of the importance of avoiding any appearance of favoritism and explained that Morton would need "to involve someone from RTC Corporate to make a decision on how to respond" if Olch desired to pursue the purchase. Olch said he did not intend to do so.

Because of the amount of interest in the property, Coopers decided after several months to dispose of it by sealed bid. Coopers sent identical bid requests to four interested parties. Among other things, the bid request (i) instructed cash bidders to identify the source of cash to be delivered at closing, (ii) required a minimum of five percent of the purchase price to accompany the bid, and (iii) instructed purchasers to submit current financial statements and resumes. Bids were to be submitted to Coopers in sealed envelopes by September 29, 1993.

Two potential purchasers ultimately submitted "best and final" bids—Plaintiff Martin and Defendant Tim Lapage. Martin bid $327,000 in cash; Lapage bid $335,000 in cash. Martin's bid did not include any financial statements or resumes, but included a cover letter stating, "We assume, since this is a cash transaction, no financial statements or resume is required, but they can be provided ." Morton testified that this deficiency did not preclude consideration of the bid. After

submitting his sealed bid, Martin sent a fax to Coopers in an attempt to increase the amount of his bid by $10,000; no additional earnest money was submitted. Martin's broker, Plaintiff Frederick Moore, testified that Morton told him that it would be acceptable to raise Martin's bid by fax. However, Morton testified that Coopers viewed the attempt as invalid. Moore would have received a 3% commission if Martin had been the successful bidder. For the purpose of deciding their motion, Plaintiffs have stipulated that $327,000 can be accepted as the amount of Martin's bid.

Bald Eagle played no role in the review of the bids. Coopers notified Lapage that his bid had been selected on October 5, 1993. The $35,000 Lapage used as an earnest money payment was provided by Olch. Lapage testified that he had sought a temporary loan of the earnest money from Olch because he had previously and unsuccessfully bid on other RTC property and did not want to liquidate his other investments unless he knew he was the successful bidder. Lapage testified that Olch transferred $38,000 to his account even though $33,500 would have been enough. Lapage testified that Olch did so because Olch did not know the amount Lapage was going to bid.

Lapage testified further that between the time he submitted his sealed bid and the time he was notified that he was the successful bidder, he learned his potential business partner was no longer interested in pursuing the opportunity with him. He testified that he asked Olch if Olch would be interested in loaning him some or all of the purchase price if he could not find another investor. Olch testified that he prepared to loan Lapage the money in that event.

At the closing, the entire purchase price was paid from funds provided by the Olchs. Bald Eagle received a 6% commission. Less than two weeks after the closing, Lapage deeded the property by warranty deed to the Olchs at their request. Janet Olch testified that she insisted on the transfer of the property to her and her husband because they did not have security for the money that they had advanced. The property was then transferred to a partnership. Another Bald Eagle broker, Defendant Henry Sigg, owned a 10% interest in the partnership, Lapage owned 10%, and the Olchs owned the remaining 80%. The partnership developed the property. The Olchs never disclosed their role as the financiers of Lapage's bid to either Coopers or the RTC.

Upon learning of these circumstances, Plaintiffs asserted five claims against Defendants: (i) violation of the Federal False Claim Act, *31 U.S.C. §§ 3729–33 (1983 & Supp.1997)*, on the ground that Bald Eagle was not entitled to the listing commission it collected from the RTC because it failed to fulfill its contractual obligations; (ii) violation of RTC standards, on the ground that Bald Eagle, as a RTC subcontractor, failed its statutory duty to treat offerors fairly and consistently, (iii) common law fraud, (iv) interference with prospective economic relationships, and (v) breach of a broker's duty to deal fairly and honestly with purchasers. Plaintiffs request summary judgment on their first and second claims. Defendants' crossmotion seeks judgment on all Plaintiffs' claims.

## II. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure* is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir.1995). In applying the summary judgment standard, the factual record and reasonable inferences therefrom are to be examined in the light most favorable to the non-movant. *Id.*

## III. DISCUSSION

### A. Violation of the Federal False Claims Act.

Under the Federal False Claims Act ("FCA"), a person who knowingly presents a false or fraudulent claim for payment to the United States or who uses a false record or statement to get a false claim paid is liable to the United States for a civil penalty of between $5000 and $10,000 plus three times the amount of any damages the government sustains. *31 U.S.C. § 3729(a) (Supp.1997)*. Plaintiffs claim Defendants violated the FCA by causing the RTC to pay them a commission under false pretenses and by a fraudulent course of conduct. Specifically, Plaintiffs claim Defendants collected a commission from the RTC to which, Plaintiffs assert, Defendants knew they were not entitled because they had failed to perform certain acts explicitly required under the listing agreement, specifically, to disclose the Olchs' role as financier of Lapage's bid, to advertise the property in newspapers of general circulation, and to list the property on the Multiple Listing Service within three days after executing the listing agreement. As support for their claim, Plaintiffs point to a clause in the listing agreement providing that "[n]o commission shall be deemed earned in any circumstance unless and until (a) Broker has timely and strictly performed all covenants and obligations and has complied with all conditions required by this Agreement."

### 1. False Statements under the FCA.

Defendants argue that the alleged breaches raise questions of contract interpretation, which are not actionable under the FCA. In support of their position, Defendants cite to the decision of the Ninth Circuit Court of Appeals in *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir.1995). In *Butler,* the Ninth Circuit upheld the lower court's grant of a directed verdict in favor of the FCA defendant, a helicopter manufacturer that had been accused of submitting false test reports to the United States Army regarding the performance of communications and navigation systems on Apache helicopters.

The major basis for the lower court's decision was its finding that the Army knew about the manufacturer's deviations from test plans and failures to pass tests, such information flowing freely between the Army and the manufacturer in the context of "a complicated, sophisticated, and highly technical military procurement program." *Id.* at 326. From this finding, the district court concluded that the plaintiff had failed to present legally sufficient evidence that any allegedly false statement was made with the requisite intent, namely, knowing presentation of what is known to be false. On appeal, the plaintiff did not dispute the lower court's finding, but argued that knowledge by the Army was not a defense because the technical representatives who were aware of the manufacturer's shortcomings did not have the authority to modify contract requirements. In upholding the lower court, the Ninth Circuit distinguished between questions of contract interpretation and false statements or claims under the FCA, holding that to the extent the plaintiff alleged the manufacturer "failed to comply strictly with contractual requirements in planning and reporting the testing, and that those making modifications had no authority to do so, [the plaintiff's claim] is a contract dispute" and not actionable under the FCA. *Id.*

The Ninth Circuit construed the rest of the plaintiff's allegations as "FCA material" and examined the individual false statements the plaintiff alleged the manufacturer had made "to determine, whether, if they are arguably false, the government's knowledge of their deficiencies negates [the manufacturer's] intent." *Id.* at 326–27. The Ninth Circuit ultimately concluded, with respect to each statement, either that it was not false or that discrepancies in the statement were known to and approved by the Army.

Applying the same approach here, two of the false representations must be excluded as contract disputes not actionable under the FCA. With respect to Bald Eagle's failure to advertise the property in newspapers of general circulation, Defendants point out that the listing agreement did not obligate them to do so within any designated time frame and that their marketing efforts

were cut short when Coopers unilaterally determined to dispose of the property by sealed bid. Defendants also point to the deposition testimony of Morton, who stated that he was aware of Bald Eagle's efforts to market the property and was satisfied with them. With respect to Bald Eagle's failure to list the property on the Multiple Listing Service within three days after executing the listing agreement, Defendants point out that Defendants could not list the property before the RTC filled out a specific form, which the RTC never did because of its decision to use sealed bids. Whether Defendants breached the listing agreement under these circumstances is a matter of contract interpretation.

■ Defendants' failure to disclose the Olchs' involvement in Lapage's bid presents a very different situation and is actionable under the FCA. The Fifth Circuit Court of Appeals has held that a real estate broker's collection of a commission on a sale that the broker knows to be transacted under false pretenses is a "fraudulent course of conduct" constituting a false claim. *United States v. De Witt,* 265 F.2d 393, 395 (5th Cir.1959), *cert. denied* 361 U.S. 866, 80 S.Ct. 121, 4 L.Ed.2d 105 (1959). In that case, the real estate broker closed the sale of a home and collected a commission on a veteran's home loan even though the broker had previously learned that the veteran was ineligible for the loan because he did not intend to live in the home. Defendants' failure to disclose in this case is directly analogous to the failure of the broker to disclose in *De Witt.*

The question of negated intent does not arise with respect to this omission because neither Coopers nor the RTC had any knowledge that Defendants had such a conflict of interest.

2. Loss to the Government.

■ Defendants also argue that their undisclosed conflict did not cause the government a loss, that the government obligated itself to pay the commission if Bald Eagle advertised the property and there was a sale. This view of the listing agreement is too narrow. The RTC suffered a loss by paying Bald Eagle an unearned commission, more specifically, when Bald Eagle deprived it of the selling process for which it contracted. The RTC could have designed a contract that simply required the broker to obtain a buyer who was willing to pay the listing price. Instead, the RTC chose to draft the listing agreement to focus on the process by which the property was sold, and not merely the result, thereby assuring the RTC that the price actually paid for the property would be tested in the marketplace and would reflect fair market value. The RTC was also entitled to the honest and undivided loyalty of its fiduciary and a process that was free from both the appearance of impropriety and actual conflicts of interest. Defendants' undisclosed conflict deprived the government of an important contractual benefit. The fact that quantifying the value of that process will be difficult does not make the government's loss less palpable. Even if the government had suffered no loss as a result, Bald Eagle, as the submitter of a false claim or statement, would still be liable for a civil penalty. *United States ex rel. Schwedt v. Planning Research Corp.,* 59 F.3d 196, 199 (D.C.Cir.1995).

3. Standing.

■ Plaintiffs have standing to maintain their *qui tam* action. Defendants correctly note that standing usually requires constitutional considerations of whether the plaintiff sustained an "injury in fact," whether this injury is traceable to the defendant's actions, and whether a ruling in the plaintiff's favor will redress the injuries. They also note that standing usually involves prudential considerations of whether the plaintiff's interests fall within the statute's zone of interests. However, in arguing that Plaintiffs lack standing here, Defendants have failed to appreciate how those considerations operate in the context of a *qui tam* action under the FCA.

■ Prudential standing considerations have no application to *qui tam* actions under the FCA because Congress has expressly granted Plaintiffs the right to bring a civil action seeking damages and penalties. *31 U.S.C. § 3730(b) (Supp.1997); see also Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) *("Moreover, Congress may grant an express right of*

action to persons who would otherwise be barred by prudential standing rules.").

Regarding the constitutional elements for standing under the FCA, "the government, not the relator, must have suffered the 'injury in fact' required for Article III standing." *United States ex rel. Milam v. University of Texas,* 961 F.2d 46, 49 (4th Cir.1992). As explained above, the RTC is capable of establishing injury in fact (payment of an unearned commission), causation (Defendants' undisclosed conflict), and redressability (loss of commission under the terms of the listing agreement and other money damages). Consequently, Plaintiffs will satisfy the requirement as well.

Accordingly, summary judgment is granted to Plaintiffs with respect to Defendants' liability under Plaintiffs' first cause of action.

### B. Violation of RTC Standards.

#### 1. Statutory Overview.

Plaintiffs claim that Defendants violated RTC regulations designed to ensure the fair and consistent treatment of offerors. Defendants primary argument in defense is that such regulations do not afford Plaintiffs a private right of action. With a view toward addressing that issue, a brief and preliminary overview of the statutory framework in which the regulations operate is helpful. By enactment of the Federal Home Loan Bank Act, Congress established the RTC to oversee the sale or other disposition of assets of failed thrift institutions. *See 12 U.S.C. § 1441a(b)(1) and (3) (Supp.1997).* To oversee and monitor the operations of the RTC, Congress established the Thrift Depositor Protection Oversight Board. *See 12 U.S.C. § 1441a(a)(1)-(5)-(6) (Supp.1997).*

By enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Congress required the Oversight Board to develop a strategic plan to guide the RTC's functions and activities. The minimal contents of the strategic plan were delineated by Congress and included a direction to the Oversight Board to develop "[s]tandards for adequate competition and fair and consistent treatment of offerors."

12 U.S.C. § 1441a(a)(14)(B)(viii) (Supp. 1997).

Consistent with this Congressional mandate, the Oversight Board and the RTC promulgated 12 C.F.R. § 1606 ("Part 1606") to ensure that RTC employees, agents, and independent contractors "[p]rovide for fair, nondiscriminatory treatment and competition among prospective bidders," and "keep market participants and other interested parties fully informed." *54 Fed.Reg. 46574, 46578–83 (1989).*

#### 2. Defendants' Conduct.

Plaintiffs allege that Bald Eagle's failure to disclose the Olch's relationship with Lapage violated four Part 1606 requirements. First, Part 1606 requires RTC contractors to follow specific procedures to notify the RTC and obtain necessary waivers when organizational conflicts of interest develop, which include any situation where "the contractor or any related entity has an interest or relationship which could adversely affect the contractor's ability to perform under the contract or to represent the RTC." *12 C.F.R. § 1606.2(j)(2) (1993).*

Second, Part 1606 requires RTC contractors to notify the RTC when personal conflicts of interest arise and either disqualify the affected person or seek waivers. A personal conflict means "a business or financial interest of an individual, his or her spouse, minor child or other person with whom the individual has a close personal relationship, which could adversely affect the individual's ability to perform under the contract or represent the interests of the RTC." *12 C.F.R. § 1606.2(m) (1993).*

Third, Part 1606 imposes general standards governing the activities of independent contractors of the RTC, including a prohibition against contractors or their related entities acting for the RTC in any matter in which the contractor or related entity has a conflict of interest unless the Contractors' Contracts Committee or the Outside Counsels' Conflicts Committee has determined that such participation is appropriate. *12 C.F.R. § 1606.8(a)(1) (1993).*

Lastly, Part 1606 imposes limitations on activities undertaken by RTC contractors concurrently with and subsequent to their involvement with the RTC, including prohibitions on contractors engaging in contracts with third parties that relate to work being performed or already performed for the RTC, prohibitions on contractors who have been engaged by the RTC to establish a sales price for a property or asset entering into a subsequent contract with the RTC to purchase that asset or assisting someone else to purchase that asset, and prohibitions on contractors acting for the RTC in the same particular matter in which it or a related entity has a business or financial interest. *12 C.F.R. § 1606.9 (1993).*

In response, Bald Eagle argues that whether a potential conflict of interest "could adversely affect the individual's ability to perform under the contract or represent the interests of the RTC" is a subjective determination to be made by the contractor and that neither Olch nor anyone else at Bald Eagle saw any potential adverse impact. This argument begs credulity and is contradicted by facts in the record, particularly by the fact that Olch was personally reminded of the importance of avoiding conflicts of interest and the appearance of favoritism by Morton's letter, which rejected Olch's offer to buy the property on those grounds. Defendants clearly violated each of the Part 1606 provisions cited.

### 3. Standing.

■ The more difficult question is whether Plaintiffs have standing to bring a private cause of action. FIRREA does not explicitly provide a cause of action against RTC subcontractors for alleged violations of 12 U.S.C. § 1441a(a)(14)(B)(viii), the provision requiring the Oversight Board to develop standards for adequate competition and fair and consistent treatment of offerors. Therefore, "the burden is on Plaintiffs to demonstrate that Congress intended to make a private remedy available to enforce" the provision. *Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992). The answers to four inquiries are determinative:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff?

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) *(internal quotation marks and citations omitted.)* The second inquiry is the most important. *Suter*, 503 U.S. at 364, 112 S.Ct. at 1370.

#### a. *Cort* Factor One.

■ The provision on its face furnishes procedures and standards that protect and benefit offerors. This is the conclusion reached by the only other court that has directly considered whether § 1441a(a)(14)(B) provides for a private right of action. *Crowe v. Smith*, 852 F.Supp. 533, 538 (W.D.La.1994). The *Crowe* court scrutinized § 1441a(a)(14)(B) and noted that in addition to requiring standards to ensure the fair and consistent treatment of offerors, the provision also requires standards that prohibit discrimination on the basis of race, sex, or ethnic groups in the solicitation and consideration of offers; procedures for the active solicitation of offers from minorities and women; and procedures requiring that unsuccessful offerors be notified in writing of the decision within 30 days after the offer has been rejected. *Id.* at 539; *see also* 12 U.S.C. § 1441a(a)(14)(B)(viii)-(xi) *(Supp. 1997).* The *Crowe* court also reviewed FIRREA's legislative history, which shows that "Congress clearly intended for FIRREA to provide a vehicle for the 'orderly disposition of the assets of these failed institutions.'" *Id. (quoting H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 308 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 104).*

Defendants argue, however, that the legislation creating the RTC shows that the RTC owes a duty to the deposit fund alone. In support of that argument, Defendants rely primarily on *Pen–Del Mortgage Associates v. Federal Deposit Ins. Corp., 1994 WL 675502,* 1994 U.S. Dist. LEXIS 16741 (E.D.Pa.1994), which held that there is no private cause of action against the Federal Deposit Insurance Corporation ("FDIC") under 12 U.S.C. § 1823(d)(3).

*Pen–Del* was decided in the wake of *Gosnell v. Federal Deposit Ins. Corp.,* 938 F.2d 372 (2nd Cir.1991). In *Gosnell,* the Second Circuit Court of Appeals held that FIRREA did not provide a private right of action in favor of disappointed bidders, finding that a private right of action was inconsistent with the broad discretion that the FDIC had been given to dispose of its assets, specifically noting that FIRREA, which created both agencies, gave the FDIC broad discretion in the disposition of assets while simultaneously requiring the RTC to develop standards for the protection of offerors. *Id.* at 376.

After *Gosnell* was decided, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), which amended 12 U.S.C. § 1823(d)(3) to require the FDIC to take into account factors similar to those in 12 U.S.C. § 1441a(a)(14)(B), including the fair and consistent treatment of offerors. *12 U.S.C. § 1823(d)(3)(D)(iii).* The court in *Pen–Del* held that this amendment "did not change the broad discretion permitted to a receiver in winding up the affairs of failed thrifts." Examining the legislative history of FDICIA as well as FIRREA, the *Pen–Del* court concluded that the acts "were intended not to benefit the individual bidders, but to protect the respective insurance funds and the taxpayers from funding additional bailouts."

Although the conclusion reached by the *Pen–Del* court is not unreasonable, it is not consistent with the express requirements of § 1441a(a)(14)(B), which evince a clear intention that the RTC conduct its business in a manner that fosters and protects important societal values and not only in a manner that yields the highest economic returns. *Crowe* is more persuasive on this point.

b. *Cort* Factor Two.

Considering this pivotal factor, the *Crowe* court found that by mandating "the establishment of procedures and standards to protect offerors, the statute itself indicates legislative intent to create a remedy for breaches of these standards and procedures." *Crowe,* 852 F.Supp. at 540. After analyzing the statutory scheme, the court found no other remedial procedure for the enforcement of the provision against the RTC, which Congress foresaw would be sued. *Id.* This led the court to conclude that Congress implicitly intended a private right of action to lie. *Id.*

However, the regulations at issue do provide a remedial procedure for their enforcement against private contractors. The regulations provide that the RTC may rescind a contract in circumstances when there has been a failure to disclose a material fact to the RTC, there arises a conflict that has not been waived by one of the conflicts committees, or there has been a violation of the regulations. *12 C.F.R. § 1606.15 (1993).* In those situations where the RTC determines to rescind a contract, the RTC may seek damages from the contractor whose actions were the basis for the rescission and "may pursue any rights and remedies provided for by law whether or not it determines to rescind the contract." *Id.* Finally, contractors whose contracts with the RTC have been rescinded are ineligible to enter into further contracts with the RTC. *Id.* In light of this remedial scheme, the logic of the court's decision in *Crowe* does not apply with respect to private contractors. In the absence of other indications of legislative intent, this vital part of the *Cort* inquiry cannot be satisfied and Plaintiffs cannot meet their burden to demonstrate that Congress intended to make a private remedy available to enforce Part 1606.

Consequently, Defendants are granted summary judgment in their favor with respect to Plaintiffs' second cause of action.

C. Common Law Fraud.

 Defendants move to dismiss Plaintiffs' claim for common law fraud on the ground that any misrepresentations or omis-

sions Defendants might have made to the RTC concerning conflicts of interest do not provide a basis for a fraud claim by Plaintiffs. However, Plaintiffs' complaint alleges that Bald Eagle broker Henry Sigg concealed information from Martin that was necessary for Martin to submit a bid that did not contain contingencies and then encouraged Martin to prepare a bid with contingencies, which Plaintiffs allege they did to their detriment. Material issues of fact exist with respect to the substance and materiality of Sigg's statements that preclude summary judgment. Defendants' motion with respect to Plaintiffs' third cause of action is, therefore, denied.

### D. Tortious Interference with Prospective Economic Relationships.

 Defendants move to dismiss Plaintiffs' claim for tortious interference with prospective economic relationships on the ground that violation of the conflict of interest regulations is not an improper means because such regulations were not designed to benefit a class to which Plaintiffs belong, namely, potential bidders. This argument fails for two reasons. First, as discussed above, it is the finding of this Court that the regulations in question were intended to protect potential bidders. Second, in Utah the contours of the tort are defined by *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). Defendants' supporting citations are from jurisdictions whose courts have defined "improper means" more narrowly than Utah's Supreme Court did in *Leigh*. Plaintiffs have provided adequate facts to survive summary judgment under the definition of improper means contained in *Leigh*. Accordingly, Defendants' motion with respect to Plaintiffs' fourth cause of action is denied.

### E. Breach of a Broker's Duty to Deal Fairly.

Finally, Defendants move for summary judgment with respect to Plaintiffs' fifth claim on the grounds, first, that a broker's duty to deal fairly and honestly extends only to actual buyers and sellers, and, second, that the statutes relied on by Plaintiffs to establish the existence of a duty do not provide Plaintiffs with a private right of action.

In support of their claim, Plaintiffs cite to *Schafir v. Harrigan*, 879 P.2d 1384 (Utah App.1994), which quoted the Utah Supreme Court's statement that:

> In this state, it is apparent that the rule of *caveat emptor* does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

*Id.* at 1390 (*quoting Dugan v. Jones*, 615 P.2d 1239, 1248 (Utah 1980), *superseded by statute on other grounds*, 846 P.2d 1307 (Utah 1993)). The statutory duties that Plaintiffs would enforce are those contained in Part 1606 and *Utah Code Ann. § 61–2–11*, which deals with grounds for disciplinary actions against licensed realtors.

 The clear language of the Utah Supreme Court in *Dugan*, as quoted above, refutes Defendants' first contention by explicitly recognizing a duty in favor of "prospective purchasers." Moreover, the basis for the duties applied in both *Dugan* and *Schafir* is the same statutes governing licensed realtors that Plaintiffs seek to rely on here, refuting Defendants' second contention that the lack of a private right of action under a statute precludes Plaintiffs' reliance on that statute for the purpose of defining the duties owed to them as prospective purchasers in this case. Defendants' motion with respect to Plaintiffs' fifth cause of action is, therefore, denied.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment are granted in part and denied in part as set forth above.