In re 19 COURT STREET ASSOCIATES, LLC, Debtor.

19 COURT STREET ASSOCIATES, LLC, Plaintiff,

v.

RESOLUTION TRUST CORPORATION, The City of New York, Deborah C. Wright, as Commissioner of the Department of Housing Preservation and Development of the City of New York, Lauri Miller Michel, a Deputy Commissioner of the Department of Housing Preservation and Development of the City of New York, J.P. Morgan Community Development Corporation, Bankers Trust Company, and Common Ground Community Housing Development Fund Corp., Inc., Defendants.

Bankruptcy No. 95 B 43637(PBA).
Adv. No. 95–1206A(AJG).

United States Bankruptcy Court, S.D. New York.

Jan. 16, 1996.

Davidoff & Malito LLP, New York City (Robert Boneberg, Howard Weiss, of counsel) and Robinson Brog Leinwand Greene Genovese & Gluck, P.C., New York City (Robert M. Sasloff, of counsel), for Debtor.

Nixon, Hargrave, Devans & Doyle LLP, New York City (Constance M. Boland, Robert P. Fletcher, of counsel), for the Resolution Trust Corporation.

Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, New York City (Karel S. Karpe, Assistant Corporation Counsel, of counsel), for the City of New York, Deborah C. Wright, as Commissioner of the Department of Housing Preservation and Development of the City of New York, and Lauri Miller Michel, as Deputy Commissioner of the Department of Housing Preservation and Development of the City of New York.

Luskin & Stern, New York City (Lori Lapin Jones, of counsel), for Bankers Trust Company, and J.P. Morgan Community Development Corporation.

Brown Raysman & Millstein, New York City (Gabriela P. Cacuci, Scott A. Steinberg, of counsel), for Common Ground Community Housing Development Fund Corporation, Inc.

MEMORANDUM OF DECISION ON MOTIONS BY DEFENDANTS TO DISMISS THE CLAIMS FOR RELIEF IN THE ADVERSARY PROCEEDING

ARTHUR J. GONZALEZ, Bankruptcy Judge.

FACTS

19 Court Street ("Court Street"), a limited liability company, filed a Chapter 11 petition on August 21, 1995.

In 1985, the Prince George Company ("Prince George") was the owner of the premises known as the Prince George Hotel (the "Premises"). In 1985, Prince George entered into a mortgage (the "Mortgage") with Colonial Savings & Loan Association ("Colonial"). In 1991, Prince George defaulted on the Mortgage and Colonial's successor, Coreast Savings Bank, FSB ("Coreast"), began a foreclosure proceeding in New York Supreme Court. A notice of pendency was filed on January 24, 1991 and was later extended by court order on March 16, 1994.

In 1991, Coreast became insolvent and the Resolution Trust Corporation (the "RTC") became the receiver of its assets, including the interest in the Mortgage. The RTC succeeded Coreast as the plaintiff in the foreclosure action. On February 10, 1995, the RTC sold the Mortgage to Common Ground and Common Ground became the plaintiff in the foreclosure proceeding. On July 20, 1995, a judgment was entered in the foreclosure proceeding. The foreclosure sale was scheduled for August 23, 1995.

In 1993, title to the Premises was conveyed to Orient Hotel Investors Limited Company ("Orient") and Orient, in turn, in 1995, conveyed title to the Premises to Court Street. Thus, when Court Street acquired the Premises, the foreclosure proceeding was already pending. On March 9, 1995, Court Street and Orient filed a motion to intervene and obtain discovery in the foreclosure proceeding. The motion was denied on May 16, 1995. The filing of the bankruptcy petition by Court Street stayed the foreclosure sale.

This adversary proceeding was brought by Court Street alleging that the transaction allowing Common Ground to purchase the Mortgage from the RTC was achieved by improper and illegal means. Court Street argues that the City of New York (the "City") used its influence to induce the RTC to favor Common Ground over other bidders. Court Street further alleges that the City violated the New York State Constitution by securing the loan that Common Ground received to finance the Mortgage purchase. Court Street also implicates J.P. Morgan Community Development Corporation and Bankers Trust Company (collectively, the "Banks").

Under RTC procedures for the disposition of assets, not-for-profit organizations are permitted to meet or better offers made by other parties for the purchase of assets acquired by the RTC. Common Ground was informed of an outstanding offer made by a commercial party.[1] Court Street alleges that RTC gave Common Ground an extension of time to meet this offer. Common Ground made an offer to purchase the loan from the RTC on August 11, 1994. The $3 million purchase price was the same amount offered by the outside commercial party. Court Street argues, however, that this offer did not equal the terms of the pending offer from the outside commercial party respecting two other terms: 1) the nonrefundable aspect of the down payment; and 2) the time to close. Court Street maintains that even after the Common Ground offer was amended on August 22, 1994, it did not equal the terms of the offer from the outside party. The amendment made $30,000 of the down payment of $300,000, nonrefundable. The com-

1. The facts do not reveal the identity of the commercial party that made the pending offer, but it is not alleged that such party was either Court Street or Orient.

mercial party's total $300,000 deposit was nonrefundable. In addition, the commercial party agreed to close within 45 days. Common Ground agreed to close by December 30, 1994.

Common Ground was unable to close on December 30, 1994. The transaction eventually closed on February 10, 1995, and the RTC assigned the Mortgage to Common Ground. One week prior to that date, on February 3, 1995, Court Street offered the RTC $3,150,000 to purchase the Mortgage. The RTC stated it was under contract to another party and rejected the offer.

In February, 1995, the Banks loaned Common Ground $3,100,000 to enable Common Ground to purchase the Mortgage. Court Street alleges that the City and The Department of Housing Preservation and Development of the City of New York (the "HPD") agreed to secure the loan to induce the Banks to make the loan. The City, Deborah C. Wright, as Commissioner of the HPD, and Lauri Miller Michel, a Deputy Commissioner of the HPD (collectively, the City Defendants") allegedly engineered this arrangement through the HPD entering into a "Buy–Sell Agreement" with the Banks and Common Ground. Under this Buy–Sell Agreement, the City agreed to purchase the loan from the Banks at a designated maturity date for an amount equal to the funds advanced to Common Ground by the Banks. The maturity date is identified as (a) the earlier of 548 days after the date of the loan, or the date on which Common Ground acquires title to the Property, or (b) one day prior to the date that the City acquires title to the Property through an *in rem* foreclosure. None of these events has occurred. The Buy–Sell Agreement requires Common Ground to secure any payment made by the City to the Banks by issuing a note and mortgage in the amount disbursed by the City to the Banks.

Court Street notes that the City asserts a lien against the Premises for unpaid real estate taxes and water and sewer charges in the amount of $2,750,000, plus interest.

*Claims for Relief*

In its first claim for relief, Court Street alleges that, in the RTC's transaction with Common Ground, the RTC violated several sections of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), the RTC's enabling statute. The sections of FIRREA allegedly violated were: (1) 12 U.S.C. § 1441a(a)(14)(B)(viii), which requires the RTC to engage in fair and consistent treatment of offerors for assets of which it has been appointed receiver; (2) 12 U.S.C. § 1441a(a)(14)(B)(xvii), which requires the RTC to avoid political favoritism and undue influence in contracts and decisions; and (3) 12 U.S.C. § 1441a(b)(3)(C)(I), which requires the RTC to maximize the present net value return from the sale of assets of which it has been appointed receiver.

Court Street contends that it has been injured by RTC's actions because it was forced to delay its effort to renovate the Premises and it was compelled to defend its interest in the foreclosure. Court Street seeks damages in an amount that it maintains should be determined in a trial on the issue.

Court Street alleges, in its second claim for relief, that by entering into the Buy–Sell Agreement, the City has engaged in an unconstitutional loan of public moneys for private purposes, in violation of Article VIII, § 1 of the N.Y.S. Constitution. Court Street maintains that it was directly injured by the Buy–Sell Agreement because, if Common Ground had not performed under the Contract, Court Street could have purchased the Mortgage from the RTC, thereby avoiding the need to protect its interest in the foreclosure and enabling it to renovate. Court Street seeks a declaratory judgment that the Buy–Sell Agreement is unconstitutional.

The third claim for relief also relates to the Buy–Sell Agreement. Court Street maintains that the City is not authorized to make a loan to a non-profit corporation for the purpose of acquiring an interest in a mortgage. Therefore, Court Street argues that, pursuant to N.Y. General Municipal Law § 51, if the City or HPD were to perform under the Buy–Sell Agreement, that would be an illegal act and a waste of public re-

sources. Court Street seeks a declaratory judgment that the Buy–Sell .Agreement is illegal and an injunction enjoining the City and HPD from making payments to the Banks or to Common Ground under the Agreement and enjoining the parties from performing under the Buy–Sell Agreement.

In the fourth claim for relief, Court Street alleges that because Common Ground engaged in illegal and improper agreements in purchasing the Mortgage, it had unclean hands when it attempted to enforce the Mortgage in the foreclosure action. Therefore, Court Street argues that equity requires that either the judgment be vacated, or Common Ground not be permitted to enforce the judgment, or that the judgment be reduced to the amount Common Ground paid to purchase the Mortgage from RTC.

### Motions to Dismiss

The RTC moves to dismiss the first claim for relief under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R.Civ.P. 12(b)(6) for failure to state a claim for relief.

The Banks, the City Defendants, and Common Ground move to dismiss under Fed. R.Civ.P. 12(b)(1), with respect to the second and third claims for relief wherein Court Street seeks a declaratory judgment that the Buy–Sell Agreement is invalid and an injunction, enjoining the parties from performing under the Buy–Sell Agreement. These movants assert that this Court does not have subject matter jurisdiction over these claims under 28 U.S.C. § 1334(b) because these claims for relief do not arise under title 11 or relate to a case under title 11. Common Ground also moves to dismiss the fourth claim for relief on this basis.

Alternatively, the City moves to dismiss the second and third claims for relief under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. The City asserts that it complied with relevant statutes that allowed it to enter into the Buy–Sell Agreement.

Common Ground also moves, alternatively, to dismiss the second, third and fourth claims for relief for failure to state a claim for relief based on res judicata and collateral estoppel

and based on the filing of the notice of pendency.

On December 5, 1995, the parties to this adversary proceeding presented oral argument on the motions to dismiss. This Court reserved decision on those motions. At that hearing, Court Street raised an objection to this Court's consideration of certain material presented by the movants. Court Street was allowed the opportunity to file a motion to strike the material to which it objected. At a hearing held on January 11, 1996, all of the issues raised in the motion to strike were ruled on by this Court. In addition, this Court rendered its decision with respect to the motions to dismiss and "so ordered" the record. This Court also indicated that the basis for its ruling on the motions to dismiss would be supplemented by this memorandum of decision.

### DISCUSSION

Fed.R.Civ.P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R.Bankr.P. 7012(b). In considering a 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint, *Bolt Electric, Inc. v. City of New York*, 53 F.3d 465 (2d Cir.1995), and draws all reasonable inferences in favor of the plaintiff. *Id.* The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992). In reviewing a 12(b)(6) motion, the court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Industries v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir.1991).

### *First Claim for Relief*

The first claim for relief, which is asserted against the RTC, alleges that the RTC favored Common Ground over other offerors and that the RTC failed to sell the mortgage

to the highest bidder. The RTC moves to dismiss this claim for relief under Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The RTC contends that Court Street lacks standing to sue; Court Street has no private right of action; and the action is barred by the affordable housing provisions of FIRREA.

■ Standing to sue concerns "[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). The standing doctrine consists of both constitutional considerations, which relate to "the case-or-controversy requirement of Article III"; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); and prudential considerations, which are judicially imposed restraints for the Court's own governance. *Id.; See, Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ The constitutional component of standing contains three elements: (i) the plaintiff must have sustained an "injury in fact," which means that a legally-protected interest must actually have been invaded in a concrete and particularized manner; (ii) the injury must be traceable to the defendant's action, i.e., there must be a causal connection; and (iii) a ruling in favor of the plaintiff will likely redress the injury. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136.

■ The relevant prudential consideration is whether the interest which the plaintiff seeks to protect falls "within the zone of interests to be protected or regulated by the statute" in issue. *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 830.

■ To establish its standing to bring this action against the RTC as a disappointed bidder, Court Street must prove that as a result of not acquiring the mortgage, it sustained an "injury in fact," *Gosnell v. FDIC,* 938 F.2d 372, 375 (2d Cir.1991) and that as a "disappointed bidder" it is "within the zone of interests to be protected or regulated" by FIRREA. *Id.* (citation omitted). The re-quirement that the bidder be within the zone of interests to be protected is not met if the bidder's interests are only "marginally related to or inconsistent with" the purposes of the statute because Congress could not have intended to permit this type of suit. *Id.* In *Gosnell,* which dealt with a disappointed bidder who had attempted to acquire assets in the control of the FDIC, the court found that to allow the bidder to sue would be inconsistent with the broad grant of discretion given to the FDIC under 12 U.S.C. § 1821(d)(2)(G)(i)(I), (II), a section of FIRREA. *Id.* at 376. The powers and rights to carry out duties that is encompassed in that section is made equally applicable to the RTC by 12 U.S.C. § 1441a(b)(4)(A). The *Gosnell* court noted that where an agency is granted broad discretion, courts have denied standing to parties who disagree with the manner in which the agency carries out its duties. *Id.* at 376. The *Gosnell* court held that if it allowed disappointed bidders to challenge the agency's chosen method to dispose of assets, that "would undermine Congress' intent to allow [the agency] broad discretion in the disposition of its assets." *Id.* Inasmuch as the RTC is granted the same broad discretion, this analysis holds equally true for the RTC. Thus, the Second Circuit's justification for denying standing in actions against the FDIC, applies equally to Court Street's effort to challenge the decision by the RTC to accept Common Ground's bid.

Court Street refers to the *Gosnell* court's observation that where specific procedural guidelines protecting bidders rights are included in the statute, courts have granted disappointed bidders standing to sue. Court Street notes that the RTC enabling statute includes 12 U.S.C. § 1441a(a)(14)(B)(viii), a provision concerning fair and consistent treatment of offerors, therefore, Court Street asserts that as an officer it has standing.

The *Gosnell* court, however, also indicated that in the cases where standing was conferred on disappointed bidders, the bidders were seeking government contracts, not seeking to buy goods from the government. The court found this to be an important distinction because conducting business with the government was a major component of

economic life and economic sustenance in the United States. *Gosnell,* 938 F.2d at 377 n. 3.

A consideration related to and somewhat overlapping the standing issue is whether a claimant has a private right of action against the alleged violator of the statute. *Raypath, Inc. v. City of Anchorage,* 544 F.2d 1019, 1021 (9th Cir.1976). It appears that if Court Street can prove that it has a private right of action against the RTC, then it would satisfy the prudential component of standing requiring that its interests fall within the "zone of interests" to be protected by the statute.

FIRREA does not expressly grant a disappointed bidder a private right of action, thus, this Court must decide if the private remedy is implicit in FIRREA. The relevant factors for this determination were delineated in *Cort v. Ash,* 422 U.S. 66, 67, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), as follows:

(1) whether the plaintiff was one of the class for whose especial benefit the statute was enacted;

(2) whether there is any indication of legislative intent, explicit or implicit, to either create a private right of action or deny one;

(3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and

(4) whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.

Court Street argues that it has a private right of action based on the alleged violation by the RTC of 12 U.S.C. § 1441a(a)(14)(B)(viii), relating to fair treatment of offerors; § 1441a(a)(14)(B)(xvii), regarding avoidance of political favoritism; and § 1441a(b)(3)(C)(i), relating to maximizing net return value on assets. In support of its position, Court Street relies on *Crowe v. Smith,* 852 F.Supp. 533 (W.D.La.1994). The *Crowe* court held that a disappointed bidder had a private right of action against the RTC based on the provision concerning fair and consistent treatment of offerors. *Id.* at 540.

The *Crowe* court found that the first *Cort* factor was met because the statute required implementation of a Strategic Plan which included mandatory provisions concerning fair and consistent treatment of offerors, therefore, the court determined that the statute set forth procedures to protect offerors. *Id.* at 538.

The *Crowe* court found the second *Cort* factor satisfied because Congress provided guidelines for fair bidding with no specific method for an injured party to seek redress for violation of those guidelines, therefore it gleaned Congressional intent to provide a private right of action. *Id.* at 539–40.

With respect to the third *Cort* factor, concerning the underlying purpose of the legislative scheme, the *Crowe,* court referred to the problems of dealing with the insolvent thrifts and disposing of their assets. The court observed that insider abuse had been a major contributing factor for the failure of the thrifts and that the guidelines were enacted to prevent future abuses of that nature. Again, the court found that those affected by violation of the guidelines should have a private right of action to remedy that injury. *Id.* at 540.

The *Crowe* court found the fourth *Cort* factor met because FIRREA was a federal statute to manage federally-insured financial institutions, therefore, it was not a matter traditionally relegated to the states.

Contending that there is not a private right of action for disappointed bidders, the RTC relies on *Pen–Del Mortgage Assocs. v. Federal Deposit Ins. Corp.,* 1994 WL 675502 (E.D.Pa.1994.) The *Pen–Del* court found that a disappointed bidder for FDIC assets did not have a private right of action against the FDIC, even after the relevant statute had been amended to add language applicable to the FDIC similar to 12 U.S.C. § 1441a(b)(14)(c) with respect to both maximization of returns on the disposition of assets, and fair conduct in the disposition of assets. *Id.* at 2.

Following *Gosnell,* the *Pen–Del* court acknowledged the broad discretion given to the FDIC to dispose of assets. *Id.* Like the *Crowe* court, but with different results, the

*Pen–Del* court also applied the four *Cort* factors. Instead of focusing on one provision of the statute, the *Pen–Del* court looked to the overall purpose for enacting FIRREA, which was to resolve the savings and loan crisis. *Id.* at 2.

With respect to the first *Cort* factor, the *Pen–Del* court found that the statute was not intended to benefit individual bidders. Rather, it was enacted "to protect the respective insurance funds and the taxpayers from funding additional bailouts." *Id.* at 3. The court noted that the FDIC and RTC owed a "duty of care only to the insurance funds, not to the public at large, borrowers, or ... to prospective purchasers." *Id.* at 3.

The *Pen–Del* court acknowledged that the most important of the *Cort* factors was whether Congress intended to create a private right of action. *Id.* at 2. In finding the absence of Congressional intent, the *Pen–Del* court relied on several considerations. First, the FDIC retained the same broad discretion that it had prior to the amendment. Second, there is no express language in the provision conferring a private right of action on disappointed bidders, nor is there any indication in the language to that effect. Finally, the legislative history of the section does not address a private right of action for disappointed bidders. *Id.* at 2–3.

In its analysis of whether a private right of action could be implied against the FDIC based on Congressional intent, the *Pen–Del* court looked to the similar provisions applicable to the RTC for guidance in resolving whether the requisite intent was present. The court concluded that Congressional intent could not be inferred from those sections or their legislative history either. *Id.* at 2–3.

With respect to the third *Cort* factor, the *Pen–Del* court found that the underlying pur-

pose of the legislative scheme was to resolve the savings and loan crisis. *Id.* at 2. The court also found that the provision dealing with fair bidding procedures was enacted "to prevent taxpayers from bailing out commercial banks if insurance premiums were insufficient to cover losses at failed banks."[2] *Id.* at 3.

Therefore, the *Pen–Del* court concluded that disappointed bidders do not have a private right of action against the FDIC, notwithstanding the amendments to FIRREA adding the sections concerning the fair and consistent treatment of offerors by the FDIC and maximization of the net return on the sale of assets. This same reasoning applies equally to the RTC because all of the rights and duties of the FDIC that were referenced by the *Pen–Del* court also apply to the RTC, based on the same or comparable provisions.[3]

Another case where the court declined to find a private right of action with respect to 12 U.S.C. § 1441a(b)(3)(c)(I), the section concerning maximizing the net present value from the sale of assets was *Resolution Trust Corp. v. Villa Este Apartments Partnership,* 806 F.Supp. 594 (E.D.La.1992). Applying the *Cort* factors, the court found that because the claimant was not a creditor of the failed financial institution, it was not one of the class for whose benefit the statute was enacted. The court further found that because the statute calls for Congressional oversight of the RTC and because nothing in the legislative history suggests Congressional intent to create a private right of action, there was no intent to permit a private right of action. Finally, the court asserted that the overall scheme of the statute was to deal effectively with the failed savings associations and promote affordable housing. The court stated that the "purpose was not to arm private citizens with a weapon to wield against the

---

**2.** Inasmuch as consideration of three of the *Cort* factors favor ruling against finding a private right of action, the *Pen–Del* court did not address the fourth factor. While that factor would, as the *Crowe* court found, favor the position of the disappointed bidder because its cause of action is not one traditionally the concern of the state, consideration of the first three factors outweigh this one consideration and on balance would lead this Court to find an absence of a private right of action.

**3.** We also note that under the Resolution Trust Corporation Completion Act, 12 U.S.C. §§ 1441a(m)(1) and (2), the RTC terminated on December 31, 1995. After that date, assets and liabilities held by the RTC as receiver were transferred to the FDIC. The FDIC succeeded RTC as receiver of all institutions currently under RTC receivership.

RTC." Rather, the purpose was to prevent loss to deposit insurance funds and the U.S. Treasury. *Id.* at 597.

In *Hindes v. Federal Deposit Ins. Corp.*, 1995 WL 534248 (E.D.Pa.1995), the court applied the *Cort* factors and denied a private right of action to shareholders of a failed institution with respect to the duty of the FDIC to, *inter alia*, maximize the net present value return from the sale of assets and ensure fair and consistent treatment of offerors. The court asserted that Congressional intent to create a private right of action was the most important consideration and that such an intent should not be inferred from Congressional silence. *Id.* at 3.

This Court prefers the reasoning of the *Pen–Del*, *Villa Este*, and *Hindes* courts and finds that as a disappointed bidder, Court Street does not have a private right of action against the RTC for the alleged violation of the sections dealing with fair and consistent treatment of offerors and with maximization of net value return on assets.[4]

Inasmuch as Court Street does not have a private right of action, nor fall within the zone of interests to be protected by FIRREA, Court Street does not have standing to bring this action.[5]

Finally, this Court holds that the RTC was merely following its mandate in preferring Common Ground over the competing bidder. The section of the statute that lists the duties of the RTC includes subsection 12 U.S.C. § 1441a(b)(3)(C)(v) which directs the RTC to conduct its operations in a manner that "maximizes the preservation of the availability and affordability of residen-

tial real property for low- and moderate-income individuals." Other sections also direct the RTC to prefer offerors seeking to buy properties for low-income affordable housing, for example, 12 U.S.C. § 1441a(c)(5) provides:

> When selling any eligible multifamily housing property ..., [RTC] shall give preference, among substantially similar offers, to the offer that would preserve the highest percentage of dwelling units for occupancy or purchase by very low-income families and lower-income families and would retain such affordability for the longest term.

Court Street argues that this provision concerning transfer of property in this section does not apply to the transfer of a commercial instrument like a mortgage because 12 U.S.C. § 1441a(c)(9)(E)(i)(I) defines "eligible multi-family housing property" as property to which the RTC acquires title.

The RTC counters that the mortgage was property of the receivership estate of Coreast and that the RTC acquired title to the mortgage. Further, the RTC notes that the use of the word property encompasses all real estate assets. The RTC also observes that when Congress intended FIRREA to apply only to real property assets it used the term "real property."

The document evidencing the agreement to transfer the mortgage to Common Ground supports the position of the RTC in that it refers to the RTC, as receiver of Coreast, having "succeeded to all right, title and interest in and to the Note, the Mortgage, and the Loan Documents" that it was transferring to

---

**4.** For the same reasons that application of the *Cort* factors does not result in a private right of action with respect to maximization of assets and the fair and consistent treatment of offerors, Court Street does not have a private right of action under 12 U.S.C. § 1441a(a)(14)(B)(xvii), the section that directs the RTC to avoid political favoritism and undue influence.

**5.** Although our ruling makes it unnecessary to address the issue of "injury in fact", we find that Court Street would not satisfy the constitutional component of standing by establishing an injury in fact. The bid with which Common Ground competed was that of an undisclosed bidder. The RTC accepted Common Ground's bid over that bidder, not over Court Street's bid. Thus,

Court Street was not the aggrieved party by the RTC preferring Common Ground. At the time Court Street attempted to bid, the RTC was already under contract with Common Ground. All of the debtor's allegations regarding injury are premised upon the fact that but for the RTC's preference of Common Ground, it would have been the successful bidder. The debtor has made a "quantum leap" over the undisclosed bidder. The debtor fails to allege that had the RTC not acted improperly that bidder would not have gone to contract and purchased the mortgage. Therefore, the debtor's alleged injury is too speculative to meet the injury in fact standard.

Common Ground. This Court agrees that when Congress desired to refer to real property, it used the term real property. Further, the underlying purpose of FIRREA directed the RTC to prefer bids like that of Common Ground. The overall thrust of the transaction between the RTC and Common Ground was to allow Common Ground to acquire the mortgage and then foreclose on it in order to enable Common Ground to acquire the Premises to develop and use it as residential real property to house homeless and low-income families. The RTC was attempting to comply with its duty to maximize available and affordable low-income residential housing.

Thus, the RTC's motion to dismiss the first claim for relief under Fed.R.Civ.P. 12(b)(6) is granted because Court Street lacks standing to bring this action; Court Street does not have a private right of action; and the RTC acted properly and in conformity with its mandate and with the affordable housing provisions of its enabling statute.

*Second and Third Claims for Relief*

 Fed.R.Civ.P. 12(b)(1) is incorporated into bankruptcy procedure by Fed.R.Bankr.P. 7012(b). In considering a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the complaint is viewed liberally and the court accepts as true all material facts alleged in the complaint. *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 775 F.Supp. 101, 103 (S.D.N.Y. 1991). However, the party seeking to invoke the court's jurisdiction has the burden of establishing subject matter jurisdiction. *Id.* at 104. If subject matter jurisdiction is in issue, the court may consider evidence presented by affidavit or otherwise. *Kamen v. American Telephone & Telegraph*, 791 F.2d 1006, 1011 (2d Cir.1986); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir.1976). The court may consider matters outside of the pleadings without converting a Rule 12(b)(1) motion into one for summary judgment. *Merola v. National R.R. Passenger Corp.*, 683 F.Supp. 935, 937 (S.D.N.Y.1988).

 The bankruptcy courts' jurisdiction "is grounded in and limited by statute." *Cel-*

*otex Corp. v. Edwards*, —— U.S. ——, ——, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995). District courts have original and exclusive jurisdiction of all cases under title 11; 28 U.S.C. § 1334(a); and have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under title 11. 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a), the district courts may refer any such cases or proceedings to the bankruptcy judges for the district. The United States District Court for the Southern District of New York has promulgated a "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984 (Ward, Acting C.J.)

Court Street maintains that this Court has jurisdiction to determine the validity of the Buy–Sell Agreement because it is "related to" its bankruptcy case.

The legislative history of § 1471(b), the predecessor section § 1334(b), makes clear that the comprehensive grant of jurisdiction to the bankruptcy court, by the inclusion of the "related to" language, was meant to allow that court to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir.1984), *citing*, H.Rep. No. 598, 95th Cong., 2d Sess., 43–48, *reprinted in* 1978 U.S.C.A.A.N. 5963, 6004–08. The *Pacor* court went on to note, however, that there were limitations to this jurisdictional grant. *Id.* In *Celotex*, the Supreme Court cited this limitation with approval noting that "a bankruptcy court's 'related to' jurisdiction cannot be limitless." *Celotex*, —— U.S. at ——, 115 S.Ct. at 1499.

The *Pacor* court concluded that the presence of subject matter jurisdiction required a "nexus" between the related civil proceeding and the bankruptcy case. *Pacor*, 743 F.2d at 994. A civil proceeding is related to the bankruptcy case if it could "conceivably have any effect" on the bankruptcy estate. *Id.* "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any

way impacts upon the handling and administration of the bankruptcy estate." *Id.*

■ It is not sufficient that the putative "related to" proceeding and a controversy involving the bankruptcy estate have common issues of fact to confer subject matter jurisdiction. "Judicial economy itself does not justify federal jurisdiction." *Id.*

In *Celotex,* —— U.S. ——, 115 S.Ct. at 1499 n. 6, the Supreme Court notes that the test adopted by the Second Circuit for determining whether there is "related to" jurisdiction is exemplified by *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983).

In *Turner,* the Second Circuit also refers to the legislative history of 28 U.S.C. § 1471, the predecessor section to 28 U.S.C. § 1334(b), where Congress explained its reason for conferring comprehensive jurisdiction in the court administering the bankruptcy case. The House Report states that there was no reason why Congress could not "in the exercise of its power under the Bankruptcy Clause of the Constitution confer jurisdiction over all litigation having a *significant connection* with the bankruptcy. *Turner,* 724 F.2d at 340–341, *citing,* H.Rep. No. 95–595, 95th Cong., 2d Sess., 47–48, *reprinted in* 1978 U.S.C.A.A.N. 5787, 5963, 6009. (emphasis added). The Second Circuit held that the use of the phrase "significant connection" was meant to put a limit on "related to" jurisdiction. *Turner,* 724 F.2d at 341.

The *Turner* court cites and concurs with a treatise that suggests there would not be jurisdiction in a situations where the "related" controversy is too tangential to the bankruptcy case. *Turner,* 724 F.2d at 341. The court must anticipate whether the resolution of the dispute could conceivably effect the estate's administration. "[R]elatedness does not lie where the dispute, while 'conceivably' related to the bankruptcy estate, is so only remotely." *In re Holland Industries, Inc.,* 103 B.R. 461, 468 (Bankr.S.D.N.Y.1988).

■ In the case at bar, the Buy–Sell Agreement is an agreement between the Banks, the City and Common Ground. Court Street is not a party to the Buy–Sell Agreement, nor was it even the owner of the Premises when the contracting parties entered into the Buy–Sell Agreement. The Banks are not creditors of the debtor's estate. While other branches of the City, for example the Department of Finance, are creditors, the City Defendants are not creditors. Moreover, even if the agreement is invalidated, it would not directly affect the estate or its administration. Nor would it increase the assets or affect the liability of the debtor. Rather, the invalidation of the Buy–Sell Agreement would directly affect Common Ground, the debtor's creditor, by impacting on the identity of Common Ground's lender. Debtor's counsel acknowledged that there were various contingencies that could result from the invalidation of the Buy–Sell Agreement. Indeed, there is no certainty that Common Ground would not be able to conclude its arrangement by obtaining funds from another source, nor does Court Street allege that no other source of funding would be available. Thus, any impact on the administration of the debtor's estate resulting from the invalidation of the Buy–Sell Agreement is too remote to invoke our jurisdiction.

■ This Court also notes that in *First Fidelity Bank, N.A. v. Prime Motor Inns, Inc. (In re Prime Motor Inns, Inc.),* 130 B.R. 610, 614 (S.D.Fla.1991), the court held that 28 U.S.C. § 1334(b) does not confer jurisdiction in the bankruptcy court over contracts between non-debtors. The *First Fidelity* court found that "[t]he Bankruptcy Court is not empowered to interfere with a contract between non-debtors because it perceives that carrying out the contract could adversely affect the estate." *Id.* This Court does not rule out the possibility that there may be cases where a contract involving others, but not the debtor, may directly affect the estate in such a manner that it would justify the assertion of jurisdiction. However, in considering such a case, the court must especially insure that there is a direct and significant connection between the contract and the debtor's estate. This, however, is not such a case. The connection between the Buy–Sell Agreement and the administration of the debtor's estate is too remote.

Thus, Court Street's second and third claims for relief are dismissed for lack of subject matter jurisdiction.

### Fourth Claim for Relief

The preclusive effect given to the judgment of a New York State Court by a federal court is determined by reference to New York law. *Rameau v. New York State Dep't of Health,* 741 F.Supp. 68, 70 (S.D.N.Y. 1990). *citing,* 28 U.S.C. § 1738.[6] This Court must give the foreclosure judgment the same effect that it would be given by New York's courts.

### Res Judicata

New York courts apply the doctrine of res judicata, or claim preclusion, which holds that a valid final judgment acts as a bar to future actions between the same parties on the same cause of action. *Reilly v. Reid,* 45 N.Y.2d 24, 27, 407 N.Y.S.2d 645, 647, 379 N.E.2d 172, 174 (1978). The purpose of the res judicata doctrine is to assure finality of the dispute. *Id.* at 28, 407 N.Y.S.2d at 647, 379 N.E.2d at 175. In deciding whether res judicata applies, New York courts employ a transactional analysis. That is, once a final judgment concerning a claim is rendered, "all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981). The judgment in the prior action is conclusive as to the later action with respect to matters actually litigated in the earlier action and, in addition, matters that could have been litigated. *Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.,* 250 N.Y. 304, 306, 165 N.E. 456, 457 (1929). In any subsequently filed action, the judgment rendered in the earlier suit is binding on the parties to that earlier suit or their privies. *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 259 (S.D.N.Y.1978), *aff'd,* 603 F.2d 214 (2d Cir.1979). Privity is defined as a "mutual or successive relationship to the same rights of property." *Litchfield v. Crane,* 123 U.S. 549, 551, 8 S.Ct. 210, 211, 31 L.Ed. 199 (1887). The party in privity is bound to the same extent as the party who actually participated in the earlier action because the parties have like interests. They are "identified ... in interest." *Id.* This identity of interest makes the earlier judgment conclusive with respect to both the parties and their privies. *Id.* Res judicata applies to subsequent actions affecting assignees of parties to the earlier action, *Price,* 455 F.Supp. at 259, if the interest was transferred to the assignee after the commencement of the earlier action. *Teleprompter Corp. v. Polinsky,* 447 F.Supp. 53, 56 n. 5 (S.D.N.Y.1977).

In New York courts, the effect given in a later action to a judgment rendered in an earlier action that affected title to real property is also impacted upon if a notice of pendency related to the earlier action was filed, pursuant to N.Y.Civ.P.L. & R. (N.Y.CPLR) § 6501.[7] Once a notice of pendency is filed, any party who subsequently records a conveyance or incumbrance on that property, is bound by all proceedings in the action relating to that earlier filed notice of pendency. *Goldstein v. Gold,* 106 A.D.2d

6. 28 U.S.C. § 1738 provides, in relevant part:
 The records and judicial proceedings of any court of any ... State, Territory or Possession [of the United States] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

7. N.Y.Civ.Prac.L. & R. § 6501 provides in relevant part:
 A notice of pendency may be filed in any action in a court of the state or of the United States in which the judgment demanded would affect the title to, or the possession, use or enjoyment of, real property, except in a summary proceeding brought to recover the possession of real property. The pendency of such an action is constructive notice, from the time of filing of the notice only, to a purchaser from, or incumbrancer against, any defendant named in a notice of pendency indexed in a block index against a block in which property affected is situated or any defendant against whose name a notice of pendency is indexed. A person whose conveyance or incumbrance is recorded after the filing of the notice is bound by all proceedings taken in the action after such filing to the same extent as a party.

100, 102, 483 N.Y.S.2d 375, 377–78 (2d Dept. 1984), *aff'd*, 66 N.Y.2d 624, 495 N.Y.S.2d 32, 485 N.E.2d 239 (1985). The notice of pendency gives notice to the world of the party's potential rights and serves as a warning that anyone who then seeks to acquire rights in the property in issue is subject to the rights in the property of the party who filed the notice, as those rights may thereafter be established in the pending action. *Id.*, 106 A.D.2d at 102, 483 N.Y.S.2d at 378. As a matter of law, a party who subsequently records a conveyance regarding the property in issue, in the notice of pendency, is bound by the result of the proceedings in that action "to the same extent as if he were a party" to the action. *5303 Realty Corp. v. O & Y Equity Corp.*, 64 N.Y.2d 313, 318, 486 N.Y.S.2d 877, 880, 476 N.E.2d 276, 279 (1984) *citing*, N.Y.CPLR § 6501. A purchaser of the property "can obtain no better title than the vendor." *Goldstein*, 106 A.D.2d at 102, 483 N.Y.S.2d at 378. The purchaser may not even avoid this result by attempting to intervene in the underlying action. *Id.*

■ The public policy underlying the function of the notice of pendency is to prevent the defeat or avoidance of a judgment obtained in an action affecting property by the alienation of that property during the pendency of the action. *Mechanics Exchange Savings Bank v. Chesterfield*, 34 A.D.2d 111, 113, 309 N.Y.S.2d 548, 550 (3d Dept.1970). The notice of pendency rule derives from a common law doctrine that sought to insure that rights established in a pending action were given effect. *Goldstein*, 106 A.D.2d at 104, 483 N.Y.S.2d at 380 (dissenting opinion). The doctrine recognized that an owner could defeat another party's rights in the subject property by selling or assigning the property before the judgment was rendered, thereby forcing the party attempting to enforce its rights to commence a new suit against the vendee or assignee, only to again be defeated by a new sale or assignment. *Id.* Through the common law doctrine, courts retained control over the property and were able to effect justice. *5303 Realty*, 64 N.Y.2d at 319, 486 N.Y.S.2d at 881, 476 N.E.2d at 280. In the same manner, the statutory notice of pendency is meant to allow an action to end and not allow

parties to evade the justice of the court. *Mechanics Exchange*, 34 A.D.2d at 113, 309 N.Y.S.2d at 550.

■ Common Ground contends that because Court Street is in privity with Orient and Prince George, res judicata bars Court Street from relitigating issues that were the subject of the prior action.

Court Street argues that even if it is in privity with Orient and Prince George, to successfully assert the principle of res judicata against Court Street, it must be found that Prince George's incentives in pursuing the lawsuit were substantially similar to that of Court Street. In support of this proposition, Court Street cites *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir.1995). In *Chase*, an owner of a building and Chase, who held an option to purchase the building, both brought actions in 1987 against asbestos manufacturers for property damage. In 1989, Chase purchased the building. The option to purchase was structured in such a way that the presence of the asbestos did not lessen the price paid by Chase. In 1992, the original owner stipulated with the asbestos manufacturers to dismiss its action with prejudice. Chase, who still had the separate action pending, did not object to that dismissal, nor did it try to intervene in that action. Subsequently, the asbestos manufacturers sought to use the dismissal of the prior owner's action as a res judicata bar to Chase's continuation of the separate action. The manufacturer argued that as the successor owner of the building, Chase was in privity with the prior owner and bound by the dismissal of the prior owner's action. The court held that "[f]or purposes of claim preclusion, the requisite privity must be found in the substantial identity of the incentive of the earlier party with those of the party against whom res judicata is asserted." *Chase*, 56 F.3d at 346. The court found that because the presence of asbestos did not affect the price paid to the prior owner for the building, the prior owner did not have the same incentive to litigate the action as Chase. Thus, Chase was not bound by the dismissal of the prior owners action. *Id.* at 347.

The Chase court was influenced by its belief that the assertion of res judicata in Chase's separate action was "something of an ambush." *Chase,* 56 F.3d at 347. While the two related actions were not formally consolidated, they were pending before the same judge pursuant to a local rule formulated "to reduce litigants' costs by informally consolidating proceedings in related cases." *Id.* Thus, it appears that the *Chase* court forgave Chase's failure to intervene in the prior owner's action based on the fact that Chase had been lulled into the belief that its interest was being protected by its maintenance and active pursuit of a separate property damage suit.[8]

Relying on *Chase,* Court Street contends that at the time Court Street moved to intervene, Prince George no longer owned the Premises and had therefore abandoned its defense of its interest as an owner.

This argument does not take into account the fact that the foreclosure proceeding was commenced in 1991 when Prince George was the owner of the Premises and, therefore, had every opportunity and incentive to litigate its ownership interest in the foreclosure action. A notice of pendency had been filed in 1991 and extended in 1994. Thus, when the Premises were bought by Orient, in 1993, and by Court Street, in 1995, they bought the property subject to whatever decision was ultimately rendered in that pending action— an action in which Prince George had been defending its ownership interests until 1993. Further, when Court Street bought the Premises in 1995, it bought subject to the notice of pendency, aware that the foreclosure proceeding had continued against Prince George for those two years since 1993 that Prince George did not have an ownership interest to defend.

Court Street argues that for a prior action to have res judicata effect, the party involved in the prior action must have an incentive to defend the entirety of the action and that after 1993, Prince George no longer had the incentive to defend an ownership interest.

This argument does not recognize the existence and purpose of the notice of pendency in actions affecting title to real property. As previously noted, the reason for the notice of pendency doctrine is to prevent parties from defeating or avoiding a judgment obtained in an action affecting real property by alienation of the property during the pendency of the action. *Mechanics,* 34 A.D.2d at 113, 309 N.Y.S.2d at 550. The basis for the development of the notice of pendency principle was an effort to circumvent the very argument Court Street now advances.

If a purchaser of real property believes that it has an interest in the property that is not being adequately represented, it is required to petition the court to intervene in the pending action. Indeed, Court Street and Orient sought to intervene and seek discovery in the New York Supreme Court foreclosure action. In its motion to intervene in the state foreclosure action, Court Street raised the issue of the alleged illegal and improper use of City funds that resulted in the assignment of the mortgage by the RTC to Common Ground. Therefore, Court Street attempted to intervene in the state court foreclosure action, maintaining that it had an interest in the property that was not adequately represented. On May 16, 1995, the state court denied the motion to intervene and the discovery request. On August 17, 1995, Court Street and Orient appealed that decision to the New York Appellate Division, First Department.

 The fact that Court Street appealed the state court's judgment because it believes that court's ruling was not correct does not affect the judgment's preclusive effect. New York courts find the prior judgment to have preclusive effect without inquiring into whether the decision rendered or the finding upon which it was based is correct. *Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp.,* 250 N.Y. 304, 306, 165 N.E. 456, 457 (N.Y.1929). Any error must be corrected by a direct review of the prior judgment. *Id.* The parties may not collater-

---

8. The *Chase* court also commented on the fact that the defendant in the action was not being forced to expend resources to relitigate an identical action to one already defended in another forum. Rather, the actions were in the same court, before the same judge, thus, discovery or other pre-trial proceedings could be considered to apply to both actions. *Chase,* 56 F.3d at 347.

ally attack the decision in another forum. Appealing the ruling was the proper course of action if Court Street believed the New York Supreme Court's ruling was in error. In addition, the fact that the decision is on appeal does not affect its res judicata effect. *See, Petrella v. Siegel,* 843 F.2d 87, 90 (2d Cir.1988).

### Collateral Estoppel

■■■■ New York courts also apply the doctrine of collateral estoppel, or issue preclusion. This principle "prevents a party from relitigating an issue clearly raised in a prior action and decided against that party or those with whom they share privity." *Conte v. Justice,* 996 F.2d 1398, 1400 (2d Cir.1993). Like res judicata, collateral estoppel works to conserve judicial resources and promote finality of judgments. *Id.* To apply collateral estoppel, the court must decide if the issue litigated is identical to the issue decided in the earlier action and also that the party to be bound had a full and fair opportunity to litigate the issue in the prior action. *Id.*

Common Ground urges that in addition to res judicata barring the claims, Court Street is barred by collateral estoppel from again litigating these issues. Common Ground contends that Court Street made substantially the same arguments in its motion to intervene that it now raises in the adversary proceeding before this Court. Common Ground maintains that the same issues were raised and fully litigated in the prior action in which Court Street was in privity with Prince George. In addition, Court Street itself was a party to its motion to intervene and had a full and fair opportunity to litigate the issues that it raised. Common Ground also notes that the same documentary evidence interposed in its complaint in this adversary proceeding was the predicate for its motion to intervene in state court.

Court Street counters that the only issue decided in its motion in state court was its right to intervention and discovery. Court Street also claims that the documentary evidence in the two proceedings was not the same because at the time it filed its motion to intervene in state court, it did not have access to the Buy–Sell Agreement. Court Street contends that the adversary proceeding before this Court is its only opportunity to litigate these claims.

Because of our ruling on the issue of res judicata and our decision not to review the state court judgment, (see discussion that follows), we do not address whether collateral estoppel applies under the circumstances of this case.

### *Vacatur of the Judgment*

■■■ Court Street further argues that preclusive principles do not bar its attempt before this Court, pursuant to N.Y.CPLR § 5015,[9] to vacate or modify judgments issued by New York courts. Court Street maintains that because of Common Ground's alleged misconduct resulting in unclean hands, Court Street may move for vacatur of the foreclosure judgment pursuant to N.Y.CPLR § 5015(a)(3); and because of newly discovered evidence, comprised of the details of the Buy–Sell Agreement, it may move for vacatur of the foreclosure judgment under N.Y.CPLR § 5015(a)(2).

Therefore, Court Street seeks to have the state court foreclosure judgment vacated or modified based on the same reasons it advanced in its motion for intervention and discovery; and also based on what it labels newly discovered evidence—the details of the Buy–Sell Agreement. Thus, Court Street invites us to exercise our concurrent jurisdiction with state courts to hear its motion to vacate under N.Y.CPLR § 5015. Under the

---

**9.** N.Y.CPLR § 5015, titled Relief from judgment or order, provides, in relevant part:

 (a) On motion. The court which rendered a judgment or order may relieve a party from it upon such terms as may be just, on motion of any interested person with such notice as the court may direct, upon the ground of:

 2. newly-discovered evidence which, if introduced at the trial, would probably have produced a different result and which could not have been discovered in time to move for a new trial under section 4404; or

 3. Fraud, misrepresentation, or other misconduct of an adverse party[.]

facts and circumstances of this case, the Court finds that reconsideration of the state court judgment is more properly addressed by the state court. Therefore, in the interest of comity, this Court abstains from exercising its jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(c)(1).

## CONCLUSION

RTC's motion to dismiss the first claim for relief under Fed.R.Civ.P. 12(b)(6) is granted because Court Street lacks standing to bring the action; Court Street does not have a private right to file the action; and the RTC acted properly and in conformity with the affordable housing provisions of its enabling statute.

The motions to dismiss the second and third claims for relief under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction are granted.

Common Ground's motion to dismiss the fourth claim for relief under Fed.R.Civ.P. 12(b)(6) is granted because the state court foreclosure judgment is res judicata. In addition, in the interest of comity with state courts, this Court abstains from hearing the request to vacate the state court judgment.[10]

---

10. Based on the reasons set forth in this memorandum of decision, we have dismissed all of the claims for relief asserted in this adversary proceeding. Therefore, we do not address movants' alternate arguments for dismissal.